Allen Dickerson (*pro hac vice* pending)
Owen D. Yeates (Utah Bar No. 13901)
CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH TAXPAYERS ASSOCIATION, a Utah nonprofit corporation, | ) ) ) |
| UTAH TAXPAYERS LEGAL FOUNDATION, a Utah nonprofit corporation, and | ) ) ) ) |
| LIBERTAS INSTITUTE, a Utah nonprofit corporation, | ) ) ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) |
| SPENCER COX, in his official capacity as Utah Lieutenant Governor, | ) ) ) |
| SEAN REYES, in his official capacity as Utah Attorney General, | ) ) ) |
| JEFF BUHMAN, in his official capacity as Utah County Attorney, and | ) ) ) |
| SIM GILL, in his official capacity as Salt Lake County District Attorney, | ) ) ) |
| *Defendants*. | ) ) |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Civil Action No. _____

1

## NATURE OF ACTION

1. This case challenges certain provisions of House Bill 43, "Campaign Finance Reporting By Corporations," 2013 Utah Laws 318, as codified at Utah Code Ann. §§ 20A-11-101(40) (definition of "political purposes"); 20A-11-101(39) (definition of "political issues expenditure"); 20A-11-701 (reporting requirements entity defined as a "corporation" making "expenditures"); and 20A-11-702 (reporting requirements entity defined as a "corporation" making "political issues expenditures").

2. Plaintiff Utah Taxpayers Association is a nonprofit corporation organized under the Internal Revenue Code ("IRC") (26 U.S.C.) § 501(c)(4) and Utah Code Ann. § 16-6a-102(34).

3. Plaintiff Utah Taxpayers Legal Foundation is a nonprofit corporation organized under IRC § 501(c)(3) and Utah Code Ann. § 16-6a-102(34).

4. Plaintiff Libertas Institute is a nonprofit corporation organized under IRC § 501(c)(3) and Utah Code Ann. § 16-6a-102(34).

5. Under certain provisions of Utah's campaign finance laws, Plaintiffs Utah Taxpayers Association, Utah Taxpayers Legal Foundation, and Libertas Institute (collectively "Plaintiffs") will be forced to file reports with the Lieutenant Governor. Such reports are burdensome and will require disclosure of each organization's confidential information, including the identities and home addresses of its contributors. Plaintiffs believe such mandatory reporting is unconstitutional under the First and Fourteenth Amendments.

6. Furthermore, under certain provisions of Utah's campaign finance laws, Plaintiffs will be forced to engage in compelled speech with their contributors, in violation of the First and Fourteenth Amendments.

7. Plaintiffs also believe that certain provisions of Utah's campaign finance laws violate the Equal Protection Clause by impermissibly favoring labor organizations over corporations.

8. Plaintiffs reasonably fear that, should they fail to disclose their contributors, or report to the Attorney General as demanded, they and/or their officers may be subject to enforcement actions, investigations, and penalties levied by Defendants and their agents.

9. Utah's election laws function to chill discussion of state government and public issues by imposing vague and arbitrary regulatory burdens upon would-be speakers, such as the Utah Taxpayers Association, Utah Taxpayers Legal Foundation, and Libertas Institute, who merely wish to discuss the issues of the day.

## JURISDICTION

10. This Court has jurisdiction because this action arises under the First and Fourteenth Amendments to the United States Constitution. 28 U.S.C. § 1331 (federal question jurisdiction).

11. This Court also has jurisdiction because this action arises under Section 1 of the Civil Rights Act of 1871. *See* 42 U.S.C. §§ 1983, 1988; 28 U.S.C. § 1343(a).

## VENUE

12. Venue is proper under 28 U.S.C. §§ 1391(b)(1) ("a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located") and (b)(2) ("a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

## THE PARTIES

13. Plaintiff Utah Taxpayers Association was founded in 1922 and has slightly more than 1,000 current members. The Utah Taxpayers Association's mission is to enhance efficient, economical government by advocating for a tax code that is fair and equitable, a state education system that prepares the next generation of Utahns to succeed in the 21st century global economy, and a regulatory environment that limits the burdens on business. It is a nonprofit corporation organized under IRC § 501(c)(4) and Utah Code Ann. § 16-6a-102(34). It is headquartered in Draper, Utah, in Salt Lake County.

14. Plaintiff Utah Taxpayers Legal Foundation was founded in 1992 under IRC § 501(c)(3) and Utah Code Ann. § 16-6a-102(34). The Utah Taxpayers Legal Foundation's mission is to educate the citizens of the state of Utah as to their privileges and rights under the Constitution and laws of the United States and of the state of Utah, to secure equal protection of those laws, and to defend the human and civil rights of Utah's citizens. It is headquartered in Draper, Utah, in Salt Lake County.

15. Plaintiff Libertas Institute is a nonprofit educational and research organization founded in December 2011 under IRC § 501(c)(3) and Utah Code Ann. § 16-6a-102(34). Its mission is to advance the cause of liberty in Utah by holding public events, producing original literature, offering model legislation, and advocating for the principles of individual liberty, private property, and free enterprise. It is headquartered in Lehi, Utah, in Utah County.

16. Defendant Spencer Cox is the current Lieutenant Governor of Utah, and, accordingly, he is sued in his official capacity as the state official charged with administering and enforcing Utah's campaign finance laws. *See* Utah Code Ann. §§ 20A-11-101(5)(a) (defining the

Lieutenant Governor as the "Chief election officer"); 20A-11-701(1)(a) (imposing filing requirements "with the lieutenant governor's office" for corporations filing campaign finance reports); and 20A-11-703(2-3) (vesting the Lieutenant Governor with the ability to levy fines against corporations who fail to file such reports).

17. Defendant Sean Reyes is the current Attorney General of Utah, and, accordingly, he is sued in his official capacity as the state official charged with enforcement of Utah's criminal laws. Utah Code Ann. §§ 67-5-1(13) (Attorney General empowered to "institute and prosecute proper proceedings in any court of the state or of the United States to restrain and enjoin corporations organized under the laws of this or any other state or territory from acting illegally or in excess of their corporate powers or contrary to public policy"); 20A-11-703(3) (providing enforcement powers to Attorney General for violations of Utah's campaign finance laws).

18. Defendant Jeff Buhman is the County Attorney of Utah County, and, accordingly, he is sued in his official capacity, pursuant to his power to bring charges in state court for violations of Utah law. *See* Utah Code Ann. §§ 17-18a-401(1); 17-18a-801.

19. Defendant Sim Gill is the District Attorney of Salt Lake County, and, accordingly, he is sued in his official capacity, pursuant to his power to bring charges in state court for violations of Utah law. *See* Utah Code Ann. §§ 17-18a-401(1); 17-18a-801.

## THE FACTS

20. This case arises from portions of Title 20A, Chapter 11 of the Utah Code, as amended by House Bill 43 ("H.B. 43"), as enrolled. 2013 Utah Laws 318. It was signed into law on April 1, 2013, and went into effect on May 14, 2013. Minor amendments to the regulations created

by H.B. 43 were signed into law in March 2015 and went into effect on May 12, 2015. *See* House Bill 120, 2015 Utah Laws 204 and Senate Bill 207, 2015 Utah Laws 296.

21. The Utah Taxpayers Association was founded in 1922, and it strives to ensure that Utah is governed efficiently and economically. The organization largely focuses on tax and education policy.

22. The Utah Taxpayers Association is not under the control of any political candidate or political party.

23.  It is a corporation within the meaning of Utah Code Ann. § 20A-11-101(8).

24.  The current president of the Utah Taxpayers Association is Howard Stephenson.

25.  The Association carries out its mission in a number of ways. It holds events and conferences; hosts debates; operates an organizational Facebook and Twitter account; publishes the *Utah Taxpayer*, a monthly newsletter; lobbies; publishes reports analyzing the budgets of Utah's school districts, cities, and counties; and intervenes in political campaigns—local and statewide—in the state of Utah.

26. The Utah Taxpayers Association is a § 501(c)(4) organization, recognized as such by the Internal Revenue Service.

27. In 2014, the Utah Taxpayers Association spent funds to encourage citizens to vote on two ballot issues.

28.  The 2014 "UTOPIA[1] Campaign" included a petition website and the distribution of mailers, yard signs, and t-shirts. The "UTOPIA Campaign" centered on local municipalities' fiscal policy and debt in connection with telecommunications infrastructure.

29. Another 2014 campaign centered on the Eagle Mountain City Electric System sale. The Association supported the privatization of the utility and distributed yard signs in connection with a related ballot measure.

30. Moreover, in endorsing or opposing bills before the state legislature, the Utah Taxpayers Association frequently lists the chief sponsor of the bill.[2] In addition, the Utah Taxpayers Association issues a legislative scorecard indicating the number of times state legislators have voted in support of or in opposition to the Taxpayers Association's recommended position on bills.[3]

---

[1]  "UTOPIA" stands for "Utah Telecommunication Open Infrastructure Agency." *About UTOPIA*, http://www.utopianet.org/about-utopia/ (last visited Nov. 10, 2015); *see* Ex. A. It is a utility operating municipal telecommunications infrastructure systems in eleven Utah service areas. *UTOPIA FAQ*, http://www.utopianet.org/faq/ (last visited Nov. 10, 2015); *see* Ex. B.

[2] *See*, *eg.*, *Vote NO on HB 246*, http://www.utahtaxpayers.org/wp-content/uploads/2013/02/VOTE-NO-on-HB-246.pdf (last visited Nov. 10, 2015), Ex. C; *Vote NO on SB 267*, http://www.utahtaxpayers.org/wp-content/uploads/2013/03/VOTE-NO-on-SB-267.pdf (last visited Nov. 10, 2015), Ex. D; *Vote YES on SB 27*, http://www.utahtaxpayers.org/wp-content/uploads/2012/02/VOTE-YES-on-SB-27.pdf (last visited Nov. 10, 2015), Ex. E; *2015 Utah Taxpayers Association Legislative Watchlist*, http://www.utahtaxpayers.org/wp-content/uploads/2015/03/2015-Watchlist-FINAL.pdf (last visited Nov. 10, 2015), Ex. F.

[3] *See*, *eg.*, *Utah Taxpayers Association – 2015 Legislative Scorecard*, http://www.utahtaxpayers.org/wp-content/uploads/2015/04/2015-Scorecard-Website.pdf (last visited Nov. 10, 2015), Ex. G.

31. But the Utah Taxpayers Association's major purpose is not advocacy concerning ballot issues or candidate campaigns. In 2014, it spent 16% of its budget on such activities—far less than 50 percent.

32. The Utah Taxpayers Association has never been registered as a political action committee ("PAC") or as a political issues committee ("PIC"), as those terms are understood under relevant Utah law. Utah Code Ann. §§ 20A-11-101(34) (defining PAC); 20A-11-101(37) (defining PIC).

33. In 2016, and in future years, the Utah Taxpayers Association intends to engage in materially similar advocacy and communications to those undertaken in 2014 and other years. In particular, it would like to engage in such activity in counties where Proposition 1 is introduced for the first time or reintroduced, either endorsing or opposing the measure based on county needs.[4]

34. The Utah Taxpayers Association intends to spend a substantially similar percentage of its budget on such activity in 2016 as it spent in 2014. It will spend no more than 20% of its budget in connection with those efforts.

35. In 2015, the Utah Taxpayers Association wanted to weigh in on Proposition 1 in some counties, either in support or opposition, but it refrained from spending money on advocacy and communications as it had in the past because it feared triggering the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq.* Absent an injunction prohibiting

---

[4] Officials from Summit and Washington Counties, for example, have indicated that they may put the measure on the ballot in November 2016. *See* Utah League of Cities and Towns, *HB 362 – Transportation Infrastructure Funding* at 4, http://www.ulct.org/wp-content/uploads/sites/4/2015/08/HB-362-Informational-Packet-Final-Data.pdf (last visited Nov. 6, 2015); *see* Ex. H.

enforcement of the law against it in 2016 and other future election years, the Utah Taxpayers Association will not engage in any activity that would trigger the application of the disclosure regime.

36. Furthermore, the Utah Taxpayers Association fears that activities like its legislative scorecard, as well as disclosing the names of bill sponsors in endorsing or opposing bills or even mentioning the name of the Taxpayers Association's president in its advocacy, could trigger the PAC regulation regime codified at Utah Code Ann. § 20A-11-601, *et seq*. Absent an injunction prohibiting enforcement of this law, the Utah Taxpayers Association will not engage in any activity that would trigger application of the PAC regulation regime.

37. As an IRC § 501(c)(3) organization, the Utah Taxpayers Legal Foundation is prohibited from engaging in candidate political activity. 26 U.S.C. §501(c)(3) (banning "participat[ion] in, or interven[tion] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office").

38. Likewise, the Utah Taxpayers Legal Foundation may engage in only limited lobbying activity. 26 U.S.C. § 501(c)(3) ("no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation"); 26 C.F.R 1.501(c)(3)-1(c)(3). This includes advocating for any ballot measure or legislative change in the law. It does not include education on public policy.

39. In 2015, the Utah Taxpayers Legal Foundation refrained from spending money on advocacy and communications regarding Proposition 1 because it feared triggering the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*. In 2016, it intends to engage in advocacy and communications regarding ballot issues and will spend no more than 20% of

9

its budget in connection with those efforts. In particular, the Utah Taxpayers Legal Foundation intends to engage in such advocacy regarding Proposition 1—supporting it in some counties and opposing it in others—in any counties introducing or reintroducing the measure. It also intends to engage in materially similar advocacy and communications regarding other ballot measures, in 2016 and in future years.

40. Many of the Utah Taxpayers Legal Foundation's donors either fund its general work or a specific project that has nothing to do with the proposed tax increase under Proposition 1 or other specific measures, but the Foundation would still be required to divulge their information under the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*. The Foundation, however, feels compelled to honor the free association rights of its donors and the desire some have to remain anonymous.

41. Absent an injunction prohibiting enforcement of the law against it in 2016 and other election years, the Utah Taxpayers Legal Foundation will not engage in any activity that would trigger the application of the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*.

42. The Libertas Institute was founded in December 2011, and advocates for the principles of individual liberty, private property, and free enterprise in Utah.

43. The Libertas Institute is not under the control of any political candidate or political party.

44. It is a corporation within the meaning of Utah Code Ann. § 20A-11-101(8).

45. The current president of the Libertas Institute is Connor Boyack.

46. The Libertas Institute carries out its mission in a number of ways, including holding public events, producing original literature, and offering model legislation.

47. The Libertas Institute's major purpose is not advocacy concerning ballot issues or candidate campaigns.

48. The Libertas Institute has never been registered as a PAC or as a PIC, as those terms are understood under relevant Utah law. Utah Code Ann. §§ 20A-11-101(34) (defining PAC); 20A-11-101(37) (defining PIC).

49. In 2015, the Libertas Institute refrained from spending money opposing Proposition 1 because it feared triggering the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*. In 2016, it intends to engage in advocacy and communications regarding ballot issues and will spend no more than 20% of its budget in connection with those efforts. In particular, the Libertas Institute intends to oppose Proposition 1 in any counties introducing or reintroducing that measure. It also intends to engage in materially similar advocacy and communications regarding other ballot measures, in 2016 and in future years.

50. Many of the Libertas Institute's donors either fund its general work or a specific project that has nothing to do with the proposed tax increase under Proposition 1 or other specific measures, but the Libertas Institute would still be required to divulge their information under the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*. The Libertas Institute, however, feels compelled to honor the free association rights of its donors and the desire some have to remain anonymous.

51. Absent an injunction prohibiting enforcement of the law against it in 2016 and other election years, the Libertas Institute will not engage in any activity that would trigger the application of the disclosure regime codified at Utah Code Ann. § 20A-11-701, *et seq*.

52. As an IRC § 501(c)(3) organization, the Libertas Institute is also prohibited from engaging in candidate political activity. 26 U.S.C. §501(c)(3) (banning "participat[ion] in, or interven[tion] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office").

53. Likewise, the Libertas Institute may engage in only limited lobbying activity. 26 U.S.C. §501(c)(3) ("no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation"); 26 C.F.R 1.501(c)(3)-1(c)(3). This includes advocating for any ballot measure or legislative change in the law. It does not include education on public policy.

54. On information and belief, counties where Proposition 1 did not pass in 2015 will introduce or reintroduce Proposition 1 in 2016.

**THE LAW AT ISSUE**

**PAC reporting in Utah**

55. For the purposes of campaign finance reporting, Utah defines an "expenditure" as "a purchase, payment, donation, distribution, loan, advance, deposit, gift of money, or anything of value [or] . . . an express, legally enforceable contract, promise, or agreement to make any purchase, payment, donation, loan, advance, deposit, gift of money, or anything of value for political purposes." Utah Code Ann. § 20A-11-101(15)(a)(ii-iii). It does not include such activities when "given by a reporting entity to candidates for office or officeholders in states other than Utah." Utah Code Ann. § 20A-11-101(15)(b)(iii).

56. "'Political purposes' means an act done with the intent or in a way to influence or tend to influence, directly or indirectly, any person to refrain from voting or to vote for or against

any: candidate or a person seeking a municipal or county office at any caucus, political convention, or election." Utah Code Ann. § 20A-11-101(40).

57. For the purposes of campaign finance reporting, Utah defines a "contribution" as a transfer of "anything of value" to a "filing entity . . . when done for political purposes." Utah Code Ann. § 20A-11-101(6).

58. In general, those organizations with a major purpose of conducting expenditures are regulated as PACs.

59. Specifically, Utah defines PACs as those entities with "a major purpose" of "solicit[ing] or receiv[ing] contributions from any other person, group, or entity for political purposes; or . . . mak[ing] expenditures to expressly advocate for any person to refrain from voting or to vote for or against any candidate or person seeking election to a municipal or county office." Utah Code Ann. § 20A-11-101(34)(a).

60. PACs must register annually with the Lieutenant Governor's office. Utah Code Ann. § 20A-11-601(1)(a).

61. If an organization is organized after January 10th of a given year, it must register "no later than seven days after: (i) receiving contributions totaling at least $750; or (ii) distributing expenditures for political purposes totaling at least $50." Utah Code Ann. § 20A-11-601(1)(b).

62. Registration triggers certain reporting requirements. *See generally* Utah Code Ann. § 20A-11-602.

63. Specifically, during a calendar year in which it has received at least $750 in contributions or made at least $50 in expenditures, a PAC must file a number of reports with the Lieutenant

13

Governor. A report is due "on January 10, reporting contributions and expenditures as of December 31 of the previous year." Utah Code Ann. § 20A-11-602(1)(a)(i). Another is due "seven days before the state political convention of each major political party." Utah Code Ann. § 20A-11-602(1)(a)(ii). When elections are scheduled, a PAC must report "seven days before the regular primary date." Utah Code Ann. § 20A-11-602(1)(a)(iii). Another report is due "on September 30." Utah Code Ann. § 20A-11-602(1)(a)(iv). Finally, reports are required "seven days before [both] the municipal general election; and . . . the regular general election date." Utah Code Ann. § 20A-11-602(1)(a)(v).

64. These reports must include "a detailed listing of all contributions received and expenditures made since the last statement." Utah Code Ann. § 20A-11-602(1)(b)(i).

65. These reports must also include the name and address of any individual or group that contributes to the PAC, as well as "the amount of the contribution." Utah Code Ann. § 20A-11-602(2)(a)(i-iii).

66. "Contributions received by a political action committee that have a value of $50 or less need not be reported individually, but shall be listed on the report as an aggregate total." Utah Code Ann. § 20A-11-602(2)(b)(i).

67. The PAC's treasurer or chief financial officer must certify "that, to the best of the person's knowledge, the financial report is accurate." Utah Code Ann. § 20A-11-602(2)(a)(viii).

**PIC reporting in Utah.**

68. For the purposes of campaign finance reporting, Utah defines a "political issues expenditure" by a PIC as "any payment from political issues contributions made for the purpose of

influencing the approval or defeat of: (A) a ballot proposition; or (B) an incorporation petition or incorporation election." Utah Code Ann. § 20A-11-101(39)(a)(i).

69. It also means "a purchase, payment, distribution, loan, advance, deposit, or gift of money made for the express purpose of influencing the approval or the defeat of" such a proposition, petition, or election. Utah Code Ann. § 20A-11-101(39)(a)(ii).

70. This definition also encompasses legally enforceable contracts or agreements to make such expenditures. Utah Code Ann. § 20A-11-101(39)(a)(iii).

71. It also includes "goods or services provided to or for the benefit of another reporting entity at less than fair market value." Utah Code Ann. § 20A-11-101(39)(a)(v).

72. Utah defines a "political issues contribution" as the giving of "anything of value . . . to a political issues committee," or "an express, legally enforceable contract, promise, or agreement to make a political issues donation to influence the approval or defeat of any ballot proposition." Utah Code Ann. §§ 20A-11-101(38)(a)(i-ii).

73. In general, organizations with a major purpose of conducting political issues expenditures are regulated as political issue committees.

74. Specifically, Utah regulates as PICs those entities with "a major purpose" of active involvement in the ballot initiative process by means of several possible activities. For one, if an entity is seeking or receiving donations "to assist in placing a ballot proposition on the ballot, assist in keeping a ballot proposition off the ballot, or to advocate that a voter refrain from voting or vote for or vote against any ballot proposition," then it qualifies as a PIC. Utah Code Ann. § 20A-11-101(37)(a)(i).

75.  Similarly, if an entity has as a major purpose "mak[ing] expenditures to expressly advocate for any person to sign or refuse to sign a ballot proposition or incorporation petition or refrain from voting, vote for, or vote against any proposed ballot proposition or an incorporation in an incorporation election," then it qualifies as a PIC. Utah Code Ann. § 20A-11-101(37)(a)(ii).

76.  Finally, an entity may qualify as a PIC if a major purpose includes "mak[ing] expenditures to assist in the qualifying or placing a ballot proposition on the ballot or to assist in keeping a ballot proposition off the ballot." Utah Code Ann. § 20A-11-101(37)(a)(iii).

77.  PICs must register annually with the Lieutenant Governor's office. Utah Code Ann. § 20A-11-801(1)(a).

78.  If an organization is organized after the January 10th annual filing date, it must register "no later than seven days after: (i) receiving political issues contributions totaling at least $750; or (ii) disbursing political issues expenditures totaling at least $750." Utah Code Ann. § 20A-11-801(1)(b).

79.  PIC registration triggers many reporting requirements. *See generally* Utah Code Ann. § 20A-11-802.

80.  PICs may need to report on additional days beyond those required of PACs. A report is due "on January 10, reporting contributions and expenditures as of December 31 of the previous year." Utah Code Ann. § 20A-11-802(1)(a)(i). Another is due "seven days before the state political convention of each major political party." Utah Code Ann. § 20A-11-802(1)(a)(ii). When elections are scheduled, a PIC must report "seven days before the regular primary election date." Utah Code Ann. § 20A-11-802(1)(a)(iii). If the issue is about the

incorporation of a municipality, then a report is due "seven days before the date of [the] incorporation election." Utah Code Ann. § 20A-11-802(1)(a)(iv). Another report is due "at least three days before the first public hearing" concerning the placement of an initiative on the ballot. Utah Code Ann. § 20A-11-802(1)(a)(v). Likewise, a report is due "if the political issues committee has received or expended funds in relation to an initiative or referendum, at the time the initiative or referendum sponsors submit: (A) the verified and certified initiative packets as required by Section 20A-7-206; or (B) the signed and verified referendum packets as required by Section 20A-7-306." Utah Code Ann. § 20A-11-802(1)(a)(vi). Another report is due on September 30. Utah Code Ann. § 20A-11-802(1)(a)(vii). Finally, reports are required both "seven days before: (A) the municipal general election; and (B) the regular general election." Utah Code Ann. § 20A-11-802(1)(a)(viii).

81. This report shall contain "a detailed listing of all contributions received and expenditures made since the last statement." Utah Code Ann. § 20A-11-802(1)(b)(i).

82. "That statement shall include" the names and addresses of any individual or group that makes political issues contributions to the PIC, as well as "the amount of the political issues contribution." Utah Code Ann. §§ 20A-11-802(2)(a)(i-iii).

83. "Political issues contributions received by a political issues committee that have a value of $50 or less need not be reported individually, but shall be listed on the report as an aggregate total." Utah Code Ann. § 20A-11-802(2)(b)(i).

84. The report must also contain "a statement by the political issues committee's . . . chief financial officer certifying that, to the best of the person's knowledge, the financial statement is accurate." Utah Code Ann. § 20A-11-802(2)(a)(ix).

85. Neither the Utah Taxpayers Association, the Utah Taxpayers Legal Foundation, nor the Libertas Institute considers itself a PIC or a PAC.

**The new disclosure regime for "corporations" enacted by H.B. 43**

86. In 2013, H.B. 43 went into effect, was codified at Utah Code Ann. § 20A-11-701, *et seq*, and created a new disclosure regime for "corporations" without the "major purpose" limitations found in the PAC and PIC disclosure provisions. Utah Code Ann. § 20A-11-101(8) (defining "corporation" for purposes of campaign finance reporting).

87. This new reporting scheme applies to "[e]ach corporation that has made expenditures for political purposes that total at least $750 during a calendar year." Utah Code Ann. § 20A-11-701(1)(a).

88. A substantially similar reporting regime also applies to "[e]ach corporation that has made political issues expenditures on current or proposed ballot issues that total at least $750 during a calendar year." Utah Code Ann. § 20A-11-702(1)(a).

89. Unlike PICs and PACs, which have to report "contributor" information, H.B. 43 created a new class of reportable giver—a "donor." Under Utah law, a "donor" is defined as "a person that gives money, including a fee, due, or assessment for membership in the corporation, to a corporation without receiving full and adequate consideration for the money." Utah Code Ann. § 20A-11-101(12)(a). This "does not include a person that signs a statement that the corporation may not use the money for an expenditure or political issues expenditure." *Id*. at § 20A-11-101(12)(b).

90. Under H.B. 43, each corporation making at least $750 in political purpose expenditures must "file a verified financial statement with the lieutenant governor's office." Utah Code Ann.

§ 20A-11-701(1)(a); *see also* Utah Code Ann. § 20A-11-702(1)(a) (same for corporations making political issue expenditures).

91. Again, Utah law contains triggering events requiring that corporations file disclosure reports throughout the year. Reports are due "on January 10, reporting expenditures as of December 31 of the previous year." Utah Code Ann. § 20A-11-701(1)(a)(i). Reports are due "seven days before the state political convention for each major party." Utah Code Ann. § 20A-11-701(1)(a)(ii). Corporations must file additional reports "seven days before the regular primary election date." Utah Code Ann. § 20A-11-701(1)(a)(iii). They must again file reports on September 30. Utah Code Ann. § 20A-11-701(1)(a)(iv). Finally, corporations must file reports "seven days before the regular general election date." Utah Code Ann. § 20A-11-701(1)(a)(v); *see also* Utah Code Ann. § 20A-11-702(1)(a)(i-v) (same for corporations making political issue expenditures).

92. The statement requires that a corporation either "report . . . the money received from donors during the calendar year or the previous calendar year that the corporation has not reported in a previous financial statement," or that it report that it "did not receive any money from any donor during the calendar year or the previous calendar year that the corporation has not reported in a previous financial statement." Utah Code Ann. § 20A-11-701(2)(c)(i-ii); *see also* Utah Code Ann. § 20A-11-702(2)(c)(i-ii) (same for corporations making political issues expenditures).

93. This report "shall include: (i) the name and address of each donor; (ii) the amount of the money received by the corporation from each donor; and (iii) the date on which the

corporation received the money." Utah Code Ann. § 20A-11-701(3)(a); Utah Code Ann. § 20A-11-702(3)(a) (same for corporations making political issues expenditures).

94. Utah law requires that this donor information be disclosed in a particular way. The disclosure scheme is the same whether the corporation makes "expenditures" or "political issue expenditures." *Compare* Utah Code Ann. § 20A-11-701(3)(b) (disclosure for corporations making expenditures), *with* Utah Code Ann. § 20A-11-702(3)(b) (disclosure for corporations making political issue expenditures).

95. "[F]irst, beginning with the least recent date on which the corporation received money that the corporation has not reported in a previous financial statement, the money received from a donor that: (A) requests that the corporation use the money to make an expenditure; (B) gives the money to the corporation in response to a solicitation indicating the corporation's intent to make an expenditure; or (C) knows that the corporation may use the money to make an expenditure." Utah Code Ann. § 20A-11-701(3)(b)(i); *see also* Utah Code Ann. § 20A-11-702(3)(b)(i) (same for political issues expenditure).

96. "[S]econd, divide the difference between the total amount of expenditures made since the last financial statement and the total amount of money reported under Subsection (3)(b)(i) on a proration basis between all donors that: (A) are not described in Subsection (3)(b)(i); (B) gave at least $50 during the calendar year or previous calendar year; and (C) have not been reported in a previous financial statement." Utah Code Ann. § 20A-11-701(3)(b)(ii); *see also* Utah Code Ann. § 20A-11-702(3)(b)(ii) (same for political issues expenditure).

97. But, "[i]f the amount reported under Section 3(b) is less than the total amount of expenditures made since the last financial statement, the financial statement shall contain a statement that

the corporation has reported all donors that gave money, and all money received by donors, during the calendar year or previous calendar year that the corporation has not reported in a previous financial statement." Utah Code Ann. § 20A-11-701(3)(c); *see also* Utah Code Ann. § 20A-11-702(3)(c) (same for political issues expenditure).

98.  "The corporation shall indicate on the financial statement that the amount attributed to each donor under Subsection (3)(b)(ii) is only an estimate." Utah Code Ann. §§ 20A-11-701(3)(d); 20A-11-702(3)(d).

99. These reports are made publicly available—including the names and addresses of donors— on the Internet in accordance with Utah Code Ann. § 20A-11-103(4)(b) (requiring that "an electronic copy or the contents of each financial statement" be available "in a searchable format on a website established by the lieutenant governor").

**Utah's regulation of labor organizations involved in election-related activities.**

100.  Utah also regulates "labor organization[s] that . . . ma[k]e expenditures for political purposes or political issues expenditures on current or proposed ballot issues that total at least $750 during a calendar year." Utah Code Ann. § 20A-11-1502(1)(a).

101.  Labor organizations must file fewer reports than corporations, however. *Id.* (listing four reporting deadlines—January 10, seven days before a primary, September 30, and seven days before a general election—rather than five).

102.  Utah law favors labor organizations even more by not forcing them to reveal to the Lieutenant Governor the names and addresses of their donors. *See* Utah Code Ann. § 20A-11-1502(1)(b) (requiring only the reporting of *expenditures*, not of donors or contributors).

**Criminal and civil penalties are levied against corporations that violate Utah's new disclosure regime.**

103.   Utah law requires that the Lieutenant Governor impose a $100 fine "[i]f it appears that any corporation has failed to file any statement, if it appears that a filed statement does not conform to the law, or if the lieutenant governor has received a written complaint alleging a violation of the law or the falsity of any statement." Utah Code Ann. §§ 20A-11-703(2)(a); 20A-11-1005.

104.   "[W]ithin five days of discovery" of such a violation or allegation, the Lieutenant Governor must "notify the corporation of the violation or written complaint and direct the corporation to file a statement correcting the problem." Utah Code Ann. § 20A-11-703(2)(b).

105.   If the corporation "fail[s] to file or amend" its report "within seven days after receiving notice from the lieutenant governor," the corporation "is guilty of a class B misdemeanor." Utah Code Ann. § 20A-11-703(3)(a) and (b).

106.   The Lieutenant Governor must report any failure to file or amend a statement after notice "to the attorney general." Utah Code Ann. § 20A-11-703(3)(c).

107.   "In addition to . . . criminal" liability, the Lieutenant Governor must "impose a civil fine of $1,000 against a corporation" that fails to file or amend a statement after notice. Utah Code Ann. § 20A-11-703(3)(d).

**H.B. 43 imposes a new compelled speech regime on "corporations."**

108.   "If a corporation makes expenditures that total at least $750 during a calendar year, the corporation shall notify a person giving money to the corporation that: (a) the corporation may use the money to make an expenditure; and (b) the person's name and address may be disclosed on the corporation's financial statement." Utah Code Ann. § 20A-11-701(4); *see*

*also* Utah Code Ann. § 20A-11-702(4) (same for corporations making "political issues expenditures").

109.    A similar compelled speech regime does not apply to labor organizations. *Compare* Utah Code Ann. §§ 20A-11-701(4) (expenditures regulation of corporations), and 20A-11-702(4) (political issues expenditures regulation of corporations), *with* Utah Code Ann. § 20A-11-1502 (regulation of unions).

110.    The Lieutenant Governor is empowered to enforce this mandate. Utah Code Ann. § 20A-11-703(2).

111.    The Utah Taxpayers Association wishes to make expenditures and political issues expenditures, and the Utah Taxpayers Legal Foundation and Libertas Institute wish to make political issues expenditures, to the extent they can understand the law. *See* Utah Code Ann. §§ 20A-11-101(15)(a)(ii) (defining "[e]xpenditure" as any "payment . . . made for political purposes") and 20A-11-101(39)(a)(ii)(A) (defining "[p]olitical issues expenditure" as any "payment . . . made for the express purpose of influencing the approval or the defeat of . . . a ballot proposition").

**The First Amendment, political committee status, and disclosure.**

112.    The First Amendment protects the right of citizens "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 466 (1958). Accordingly, "compelled disclosure imposes . . . significant encroachments on [the] First Amendment rights" of free association. *Buckley v. Valeo*, 424 U.S. 1, 64 (1976).

113.    Furthermore, requiring an organization "to assume a more sophisticated organizational form, to adopt specific accounting procedures, [and] to file periodic detailed reports," also imposes burdens upon the exercise of First Amendment rights by turning "protected speech [into] a severely demanding task." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255, 256 (1986) ("*MCFL*") (Brennan, J., plurality opinion); *see also id*. at 265-66 (O'Connor, J., concurring).

114.    Complex and burdensome accounting procedures "create a disincentive for such organizations to engage in political speech." *Id*. at 254 (Brennan, J., plurality opinion); *see also id*. at 265 (O'Connor, J., concurring) ("In *Buckley*, the Court was concerned not only with the chilling effect of reporting and disclosure requirements on an organization's contributors, but also with the potential burden of disclosure requirements on a group's own speech." (citation omitted)).

115.    Given these concerns, "the subordinating interests of the State must survive exacting scrutiny." *Buckley*, 424 U.S. at 64. Exacting scrutiny is a "strict test." *Buckley*, 424 U.S. at 66.

116.    Under exacting scrutiny, a court must "rigorous[ly] review" the government's infringement of fundamental liberties and "must assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon v. FEC*, 572 U.S. ___, ___, 134 S. Ct. 1434, 1445-46 (2014) (citations omitted) (internal quotation marks omitted).

117.    In bearing its burden, the State must demonstrate "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*

*v. FEC*, 558 U.S. 310, 366-67 (2010) (quoting *Buckley*, 424 U.S. at 64, 66); *see also Free Speech v. FEC*, 720 F.3d 788, 793 (10th Cir. 2013) (observing same, citing *Citizens United*); *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir. 2010) (observing same).

118.    In the context of speech about ballot measures, as opposed to candidates, the only applicable government interest is "the informational interest[—]the public interest in knowing who is spending and receiving money to support or oppose a ballot issue." *Sampson*, 625 F.3d at 1256 (rejecting other proffered governmental interests, such as deterring corruption).

119.    In this context, the Tenth Circuit has expressed doubts concerning the government's ability to advance the informational interest by means of compelled registration and disclosure. *Id.* ("It is not obvious that there is such a public interest.").

120.    Under binding law in this Circuit, Plaintiffs may only be regulated as political committees and required to file reports disclosing their contributors if—at a minimum—obtaining specific electoral outcomes is their "major purpose," *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677 (10th Cir. 2010) (citing *Buckley*, 424 U.S. at 79), *and* the State's political committee laws may be construed in such a way, "consistent with the legislature's purpose, to avoid the shoals of vagueness," *Buckley*, 424 U.S. at 78.

**The First Amendment and compelled speech.**

121.    The Tenth Circuit has upheld disclaimer laws when they require only the identifying information of the person or group authorizing a communication, because such tailoring is a "minimally restrictive method of ensuring . . . that the ads are not funded by a candidate." *Free Speech*, 720 F.3d at 796 (upholding federal disclaimer law for advertising and

solicitations, which required specified identifying information about the person or group authorizing the communication).

122.    Utah's law goes much further, requiring that solicitations state that "the corporation may use the money to make an expenditure; and . . . the person's name and address may be disclosed on the corporation's financial statement." Utah Code Ann. § 20A-11-701(4)(a-b); *see also* Utah Code Ann. § 20A-11-702(4)(a-b) (same for political issues expenditure).

123.    Thus, rather than simply identifying the solicitor, Utah law imposes a compelled speech requirement on those raising funds.

124.    "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees . . . the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 796-97 (1988).

125.    Even in cases where the state's mandate would simply provide "factual information" that "might be relevant to the listener, and . . . could encourage or discourage the listener from making a political donation," a compelled speech statute still "clearly and substantially burden[s] . . . protected speech" and "is subject to exacting First Amendment scrutiny." *Riley*, 487 U.S. at 798; *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) ("the general rule[ is] that the speaker has the right to tailor the speech . . . not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid" (internal quotation marks omitted)).

126.    The solicitation of funds for a nonprofit corporation is "fully protected speech." *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989).

127.    Indeed, "[t]he constitutional harm of compelled speech—'being forced to speak rather than to remain silent'—'occurs regardless of whether the speech is ideological.'" *Cressman*, 719 F.3d at 1152 (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004)).

128.    Utah has neither advanced a sufficiently important rationale for its compelled speech statute nor demonstrated that it is substantially related to an important governmental interest.

**Equal protection doctrine in the context of corporations and labor organizations.**

129.    Although the Supreme Court has since ruled it unconstitutional, the Court at one point upheld campaign finance laws that treated labor organizations differently from corporate entities. *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 665-66 (1990) (upholding law that did not regulate unincorporated labor unions); *see also Citizens United* , 558 U.S. at 365 (overruling *Austin* for its unequal treatment of corporations).

130.    The *Austin* Court upheld that unequal treatment on grounds that are no longer good law. Such discredited justifications for discriminatory treatment included the supposedly "corrosive effect of [corporate] political 'war chests,'" *Austin*, 494 U.S. at 666, as well as the supposedly "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas," *id.* at 660. On the other hand, the *Austin* Court held that unincorporated labor unions could receive preferential treatment because they did not share corporations' "state-conferred advantages" and because "the funds available for a union's political activities more accurately reflects [sic] [union] members'

support for the organization's political views than does a corporation's general treasury." 494 U.S. at 665-666.

131.    The *Citizens United* Court rejected this rationale and overruled *Austin*. *Citizens United*, 558 U.S. at 341-356, 365 ("*Austin* is overruled," in part, because of the invalidity of that opinion's anti-corporate and anti-distortion rationales). Indeed, the *Citizens United* Court held that "[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." *Id*. at 365.

132.    It is disputed in the Tenth Circuit whether campaign finance laws that infringe upon the Equal Protection Clause are subject to traditional strict scrutiny or may be reviewed under exacting scrutiny. *Riddle v. Hickenlooper*, 742 F.3d 922, 927-28 (10th Cir. 2014).

133.    Either way, "state officials . . . bear the burden of proof" in showing that the government's statutory classifications survive constitutional review. *Id*. at 928.

134.    The State has advanced no constitutionally cognizable rationale as to why Utah treats labor organizations engaged in precisely the same form of speech as Plaintiffs with a softer touch. And, weighing Plaintiffs' First Amendment interests against the lack of constitutionally cognizable rationale, "'something . . . outweighs nothing every time.'" *SpeechNow.org v. FEC*, 599 F.3d 686, 695 (D.C. Cir. 2010) (*en banc*) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)) (alteration in *SpeechNow.org*).

## CAUSES OF ACTION

### Count 1
### Declaratory judgment that Utah's definition of "political purposes" at Utah Code Ann.
### § 20A-11-101(40) is unconstitutionally void for vagueness.

135.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if set forth

fully herein.

136.    Utah defines "political purposes" as "act[s] done with the intent to or in a way to

influence or tend to influence, directly or indirectly, any person to refrain from voting or to

vote for or against any . . . candidate or a person seeking a municipal or county office at any

caucus, political convention, or election." Utah Code Ann. § 20A-11-101(40)(a).

137.    Laws whose "prohibitions are not clearly defined" are "void for vagueness" because they

"trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S.

104, 108 (1972).

138.    This is particularly true "where a vague statute abut[s] upon sensitive areas of basic First

Amendment freedoms . . . Uncertain meanings inevitably lead citizens to steer far wider of

the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.*

at 109 (internal quotation marks omitted).

139.    "The First Amendment does not permit laws that force speakers to retain a campaign

finance attorney . . . or seek declaratory rulings before discussing the most salient political

issues of our day." *Citizens United*, 558 U.S. at 324.

140.    Yet, by attempting to regulate speech and association that is "done . . . in a way to

influence . . . , directly or indirectly," certain electoral outcomes, Utah Code Ann. § 20A-11-

101(40)(a), the state of Utah forces speakers to retain an attorney or to seek a declaratory ruling before daring to speak.

141.    The term "indirectly influencing" is inherently vague, and there is no available narrowing construction to rescue this definition "consistent with the legislature's purpose, to avoid the shoals of vagueness." *Buckley*, 424 U.S. at 78.

142.    Accordingly, Plaintiff Utah Taxpayers Association is entitled to a declaration that the "political purposes" definition of Utah Code Ann. § 20A-11-101(40) is unconstitutional, as are all provisions of the law that rely upon it, under the First and Fourteenth Amendments to the United States Constitution.

**Count 2**
**Declaratory judgment regarding definition of "political issues expenditure" under Utah Code Ann. § 20A-11-101(39).**

143.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if set forth fully herein.

144.    Utah law regulates as "political issues expenditures" those expenditures "made for the purpose of influencing the approval or the defeat of . . . a ballot proposition; or . . . an incorporation petition or incorporation election." Utah Code Ann. § 20A-11-101(39)(a)(i).

145.    But such a definition has consistently been found to be unconstitutionally vague. In *Buckley*, the Supreme Court grappled with a law defining "expenditures" "in terms of the use of money or other valuable assets for the purpose of . . . influencing the nomination or election of candidates." 424 U.S. at 77 (internal quotation marks omitted). The *Buckley* Court recognized "[i]t is the ambiguity of this phrase that poses constitutional problems." *Id.*

146.    Accordingly, Plaintiffs are entitled to a declaration that Utah Code Ann. § 20A-11-101(39) is unconstitutionally vague, facially and as-applied, under the First and Fourteenth Amendments to the United States Constitution.

**Count 3**
**Declaratory judgment regarding campaign financial reporting for corporations under Utah Code Ann. §§ 20A-11-701 and 20A-11-702.**

147.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if set forth fully herein.

148.    Utah's regime, which applies to any corporation spending more than $750, imposes essentially the "full panoply" of Utah's state PAC or PIC burdens on corporations making either "expenditures for political purposes" or "political issues expenditures." *See* Utah Code Ann. §§ 20A-11-701 and 20A-11-702.

149.    Regulatory and disclosure burdens to this extent are impermissible, unless an organization's "major purpose" is the making of such expenditures. *Buckley*, 424 U.S. at 79-81; *MCFL*, 479 U.S. at 262 (no compelled disclosure required of corporation unless its "independent spending become[s] so extensive that the organization's major purpose may be regarded as campaign activity"); *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. Herbert*, 581 F. Supp. 2d 1132, 1141-42 (D. Utah 2008) (quoting *Buckley*, 424 U.S. at 79) (discussing *Buckley*'s limitation of disclosure requirements to organizations with the major purpose of making expenditures).

150.    But Utah Code Ann. §§ 20A-11-701 and 20A-11-702, on their face, cover groups that only incidentally engage in such activity.

151.   Moreover, making expenditures for political purposes or political issues expenditures is not the major purpose of the Utah Taxpayers Association, which limits such expenditures to under 20% of its budget. In addition, making such expenditures is not a major purpose of the Utah Taxpayers Legal Foundation or the Libertas Institute, which cannot make expenditures for political purposes under federal law, *see* IRC § 501(c)(3), and which limit any political issues expenditures to under 20% of their budgets.

152.   Accordingly, Plaintiffs are entitled to a declaration that Utah Code Ann. §§ 20A-11-701 and 20A-11-702 are unconstitutionally vague and overbroad, facially and as-applied, under the First and Fourteenth Amendments to the United States Constitution.

**Count 4**
**Declaratory judgment that Utah's system of prorated disclosure reporting, at Utah Code Ann. §§ 20A-11-701(3) and 20A-11-702(3), is unconstitutional.**

153.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if set forth fully herein.

154.   As discussed *supra*, the burden is on the state to demonstrate that its disclosure laws bear "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United*, 558 U.S. at 366-67 (internal quotation marks omitted).

155.   The Supreme Court has upheld disclosure laws under this exacting scrutiny standard "on the ground that they would help citizens 'make informed choices in the political marketplace.'" *Citizens United*, 558 U.S. at 367 (quoting *McConnell v. FEC*, 540 U.S. 93, 197 (2003)).

156.    But, the proration disclosure system is not closely drawn to achieve the aim of helping

citizens make informed choices. For example, the system requires that corporations report

what the law acknowledges are only "estimate[s]," attributing to a small subset of donors

potentially large sums of money not donated by them. *See* Utah Code Ann. §§ 20A-11-

701(3)(b) and (d) and Utah Code Ann. §§ 20A-11-702(3)(b) and (d) (requiring that

corporations "estimate" the expenditures that did not come from donations knowingly

designated for such expenditures, attribute all these donations to only the donors who gave at

least $50 in such donations, and report these donors). Such disclosures will only confuse

voters about who is supporting candidates and ballot propositions, and about the extent of

their support.

157.    Furthermore, the complex accounting procedures of the proration system and the dislike

that some grassroots supporters may have for the inaccurate overreporting of their donations

will impermissibly lead fewer corporations to discuss issues and candidates. *See Citizens

United*, 558 U.S. at 365 ("No sufficient governmental interest justifies limits on the political

speech of nonprofit or for-profit corporations."); *id*. at 361 ("it is our law and our tradition

that more speech, not less, is the governing rule"); *Buckley*, 424 U.S. at 48-49 ("the concept

that government may restrict the speech of some elements of our society in order to enhance

the relative voice of others is wholly foreign to the First Amendment").

158.    Moreover, the law will inevitably compel the disclosure of the names and addresses of

donors whose contributions do not fund unambiguously campaign related activities. *Nat'l

Right to Work*, 581 F. Supp. 2d at 1146 ("Therefore, before applying exacting scrutiny by

determining whether the information sought by the state of Utah through its disclosure

requirements bears a substantial relation to the government's interests, the court must first determine whether the activities being regulated are unambiguously campaign related."); *id.* at 1148-1149 ("disclosure requirements may constitutionally be imposed only when they regulate activities that are unambiguously campaign related. These include: (1) contributions made by individuals or entities to a campaign or in coordination with a campaign; (2) expenditures made by individuals or entities for communications that expressly advocate for a candidate or initiative -- or its functional equivalent; and (3) expenditures made by candidates and political committees." (citation omitted)).

159.   Accordingly, Plaintiffs are entitled to a declaration that Utah Code Ann. §§ 20A-11-701(3) and 20A-11-702(3) are unconstitutionally vague and overbroad, facially and as-applied, under the First and Fourteenth Amendments to the United States Constitution.

### Count 5
### Declaratory ruling regarding the compelled speech provisions of Utah Code Ann. §§ 20A-11-701(4) and 20A-11-702(4).

160.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs as if set forth fully herein.

161.   As a general rule, the government may not compel its citizens to utter specific speech. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) ("It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." (internal quotation marks omitted)); *Riley*, 487 U.S. at 797-98 (compelled statements of both opinion and fact burden speech); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (government may not compel certain political speech).

162.    Because the solicitation of financial contributions is fully protected First Amendment speech, compelling solicitors to state the government's speech "is subject to exacting First Amendment scrutiny." *Riley*, 487 U.S. at 798.

163.    Yet, there is no substantial relation to a cognizable governmental interest in requiring that once a corporation spends $750 on expenditures or political issue expenditures, that said corporation must "notify a person giving money to the corporation that . . . the corporation may use the money to make an expenditure [or political issues expenditure]; and . . . the person's name and address may be disclosed on the corporation's financial statement." Utah Code Ann. §§ 20A-11-701(4); 20A-11-702(4).

164.    At a minimum, such a law cannot stand as applied to entities like the Plaintiffs, which do not have the major purpose of making such expenditures.

165.    Accordingly, Plaintiffs are entitled to a declaration that Utah Code Ann. §§ 20A-11-701(4) and 20A-11-702(4) are unconstitutionally vague and overbroad, facially and as-applied.

### Count 6
### Declaratory judgment that Utah Code Ann. §§ 20A-11-701 and 20A-11-702 are unconstitutional as a violation of the Equal Protection Clause of the Fourteenth Amendment.

166.    Although Utah imposes substantial disclosure and reporting requirements on corporations who engage in regulated political speech activities, it imposes a vastly lighter burden upon labor organizations that do the same. *Compare* Utah Code Ann. §§ 20A-11-701, *and* 20A-11-702 (corporations), *with* Utah Code Ann. § 20A-11-1502 (unions).

167.    "Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve

a compelling governmental interest." *Austin*, 494 U.S. at 666, *overruled on other grounds by Citizens United*, 558 U.S. at 365.

168.   At a minimum, such distinctions must pass exacting scrutiny. *See Buckley*, 424 U.S. at 64, 66; *Riddle*, 742 F.3d at 928.

169.   Yet, the government can point to no record that would cognize imposing significant disclosure and reporting requirements upon corporations, but not on labor organizations. The discredited grounds of *Austin*—such as the supposedly "corrosive effect of political 'war chests' amassed with the aid of the legal advantages given to corporations"—are certainly insufficient. *Austin*, 494 U.S. at 666; *see Citizens United*, 558 U.S. at 341-356, 365 (rejecting grounds for discriminating against corporate speech, including the antidistortion rationale); *Buckley*, 424 U.S. at 704-05 ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment").

170.   At a minimum, there is no cognizable interest in imposing greater burdens upon Plaintiffs than labor organizations.

171.   Accordingly, Plaintiffs are entitled to a declaration that Utah Code Ann. §§ 20A-11-701 and 20A-11-702 are unconstitutional, facially and as-applied, to the extent that they impose greater burdens upon corporations than are placed upon labor organizations under Utah Code Ann. § 20A-11-1502.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs Utah Taxpayers Association, Utah Taxpayers Legal Association, and Libertas Institute pray for the following relief:

A. A declaration that Utah's definition of "political purposes" at Utah Code Ann. § 20A-11-101(40) and all portions of Utah campaign finance law relying thereupon are facially unconstitutional on vagueness grounds, pursuant to the First and Fourteenth Amendments.

B. A declaration that Utah's definition of "political issues expenditure" at Utah Code Ann. § 20A-11-101(39) and all portions of Utah campaign finance law relying thereupon are unconstitutional, facially and as-applied, on vagueness grounds, pursuant to the First and Fourteenth Amendments.

C. A declaratory judgment that campaign financial reporting for corporations under Utah Code Ann. §§ 20A-11-701 and 20A-11-702 is unconstitutional, facially and as-applied to Plaintiffs, under the First and Fourteenth Amendments.

D. A declaratory judgment that Utah's system of prorated disclosure reporting, at Utah Code Ann. §§ 20A-11-701(3) and 20A-11-702(3), is unconstitutional, facially and as-applied to Plaintiffs, under the First and Fourteenth Amendments.

E. A declaratory judgment that the compelled speech provisions of Utah Code Ann. §§ 20A-11-701(4) and 20A-11-702(4) are unconstitutional, facially and as-applied to Plaintiffs, under the First and Fourteenth Amendments.

F. A declaratory judgment that Utah Code Ann. §§ 20A-11-701 and 20A-11-702 are unconstitutional as a violation of the Equal Protection Clause of the Fourteenth Amendment.

G. An injunction barring enforcement of the provisions of Utah law listed in prayers for relief A-F.

H. Reasonable costs and attorney's fees.

I. Such equitable or other relief as this Court may consider just and appropriate.

Respectfully submitted this 17th day of November, 2015.

/s/ Owen Yeates
Allen Dickerson
Owen Yeates
CENTER FOR COMPETITIVE POLITICS
124 S. West Street
Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
oyeates@campaignfreedom.org

*Counsel for Plaintiffs*

## VERIFICATION

STATE OF UTAH                          )
                                       ) ss.
COUNTY OF _Salt Lake_____           )

I, Howard Stephenson, president of the Utah Taxpayers Association and president of the Utah Taxpayers Legal Foundation, being first duly sworn, state under oath that I have read the foregoing VERIFIED COMPLAINT, and that the statements contained therein are true and correct to the best of my knowledge, information, and belief.



Subscribed and sworn before me this _16_ day of November, 2015.

_Adam Taylor_____
Notary Public

My Commission Expires: _March 30, 2016___

> **ADAM TAYLOR**
> Notary Public • State of Utah
> Commission # 654003
> My Commission Expires
> March 30, 2016

## <u>VERIFICATION</u>

STATE OF UTAH  Utah )
                                                          ) ss.
COUNTY OF ____Utah____ )

     I, Connor Boyack, president of the Libertas Institute, being first duly sworn, state under

oath that I have read the foregoing VERIFIED COMPLAINT, and that the statements contained

therein are true and correct to the best of my knowledge, information, and belief.

Subscribed and sworn before me this 16 day of November, 2015.



Notary Public

My Commission Expires: ___09/01/2019___

MCKENNA MARTIN
NOTARY PUBLIC·STATE OF UTAH
COMMISSION# 684893
COMM. EXP. 09-01-2019